Our final case for today is Perrone v. United States, or Perrone. Mr. Reedy. May it please the Court. My name is Connor Reedy, and I'm representing the appellant Joseph Perrone. This case is about the improper application of the death-resulting sentencing enhancement to my client, when there are multiple drugs from multiple sources that cause a death. I want to cover two reasons why Mr. Perrone should be resentenced. First, the change in the law in Burge v. United States, and second, ineffective assistance of counsel he received at his sentencing hearing. First, under Burge, the drugs Mr. Perrone provided must be the but-for cause of Ms. Learn's death. So let me ask you what you think that means, and I'll give you two different things it cause of death, taking her as she was. She had actually ingested other drugs, but maybe she had a weak heart, or maybe she had some other physical vulnerability. As is, these drugs are enough to kill her. It seems to me if that's the test, then it's met, because he gives her these three injections, she convulses, she dies, that's that. We have direct evidence. The other thing it might mean is, in the abstract, would a dose of 7.5 milligrams of cocaine, some purity, I don't know what the purity was, be enough to kill the average person? Whatever they've done before. And maybe in that case, maybe he didn't give her enough to kill her, and the only reason she dies is because she has all these other substances, this toxic mixture that's referred to in the autopsy. What do you think Burrage asks us to look at? I think Burrage asks whether the decedent, Ms. Learn here, would have died absent the conduct of the, here, Mr. Peroni. So do we take her as is, including what she's ingested earlier in the previous day or so? I think we do, but I do disagree, as we mentioned in the briefs, that he injected her three times. The district court, in fact, found that he only injected her once, in its opinion. But I thought it was the 7.5. The government contends that he injected, Mr. Peroni injected her three times, that's page 14 of its decision, says that he only injected her once. And that's also confirmed in the stipulation of facts, which only references Mr. Peroni injecting her once. But it depends on what the, I mean, unfortunately... Didn't he supply all of it, though? Yeah, we have a little bit of apples and oranges here, because we've got this statement from her friend that she uses 20 cc doses, but that's the solvent, that's not the solute. So you could dissolve all different amounts of cocaine in 20 cubic centimeters of water. Correct, and the evidence here shows that she was taking cocaine throughout the days and hour leading up to her eventual overdose. And that cocaine came from multiple sources. She bought it from a drug dealer the day before. She had some cocaine on her person that she started taking the morning of this eventual situation leading to the overdose. And then she also appears to have bought some additional cocaine at the end of her shift, right before she went over to Mr. Peroni's house. So there are multiple sources. But none of this has killed her yet. She dies when he injects her. Correct, but she is taking cocaine progressively over the course of this. Do we have, does the record show us anything about, either in terms of dollars or amounts for those earlier doses? It does reflect that when she, it does not reflect all of them, but it reflects that she purchased $50 worth of cocaine, I believe, from the drug dealer the morning of and she took all of that. And $50 worth of cocaine is not going to kill anybody, right? And I don't speak to that, but I will say that she was not just taking the cocaine, she was taking the heroin and she was taking alcohol. And the heroin was in barely detectable amounts by the time she dies and then we get the, and the alcohol is minimal. Could I, could I ask you, Mr. Reedy, about the problem that was left unaddressed in Burridge? My concern is that, just bear with me for a hypothetical for a moment. Let's assume we've got a drug and a lethal dose is 10 units. If I understand your position correctly, if one person delivers a dose of 6 units, and another delivers a dose of 6 units, both have provided drugs resulting in death. Would that be right? That would be correct. Okay, now suppose each one delivers a dose of 12 units. That's the question, Burridge. Is there any reason it shouldn't be obvious that each of those people is a but-for cause of death, is treated as having cause to death? I think that that would, could be the reasonable conclusion to come to, but I don't think that that is the situation here, where... Is there evidence that 7.5 grams of cocaine is not enough to kill somebody? Do we know anything about Ms. Learn's weight? There's no evidence in the record as to whether the 7.5 grams would kill her, but there's also... I thought there was some testimony, though, that people who were addicted have different sensitivities to the drugs than someone who's never encountered it before. Correct, and they did not link that to Ms. Learn herself. The medical examiner did say that even less of the cocaine could have been fatal, but it does not strictly link, and in fact none of the medical evidence here indicates whether Ms. Learn would have survived if she had not taken the cocaine Mr. Peroni supplied her, and I think that's a critical issue here, where the but-for causation, key but-for causation question is, would the person have survived absent the drug that the defendant provided? And here, there's no evidence, and in multiple cases, including Burridge and Ford, where the medical examiner has found that the cause of death was multiple drugs, but could not say that the drug that the defendant provided... But there's other evidence here, too, right? There's the evidence that she died in close proximity to having been given the shot by Peroni. There's the evidence of his testimony about the suicide pact, which indicates he was trying to kill her, and if Elaine isn't retroactive, and the standard is preponderance, and the judge, it seems to me that the other evidence becomes problematic for him. The evidence is difficult, but I believe that the evidence also shows that, as the district court noted, she was so far along, she was so far gone at the point where she asked Mr. Peroni to inject the last bit of cocaine, that she could not even inject herself at that point. And one of the original medical examiners who examined her found that the levels of heroin were sufficient to kill some individuals, so this is not a situation where it is absolutely clear that she would have survived. I'm sorry, what evidence are you referring to about the heroin? So the pathologist who originally examined Ms. Lern after her death... Is this Nanduri? I'm sorry? Is this Nanduri who did the autopsy? Yes, correct. She testified that the level of heroin in Ms. Lern's system could be enough to kill her, and none of the medical experts here examined the synergistic effects of the cocaine, the alcohol, which she took presumably after she left work or during work, and the cocaine. If the court might, I'd like to reserve the rest of my time. And could I ask you to, when you come back, be more specific about the Nanduri testimony? Because I must have missed that. Absolutely right. Thank you. Mr. Stump? Thank you. Good afternoon, Your Honors. Nathan Stump on behalf of the United States. If I may, I'd just go right to Dr. Nanduri's testimony. That was before the grand jury, and what she was asked was whether the heroin alone could have killed Terry Lern. And what Dr. Nanduri said is she didn't want to go that far. She didn't want to say one way or the other. She said because even though it's in a small amount, it could have been metabolized by the body over time, especially if she was in a comatose state. She hadn't fully died yet, so the body's still metabolizing it. So basically she acknowledged that it's a low level, but she didn't want to go so far as to rule it out conclusively. She said we'd have to know more information. We'd have to know more about the circumstances under which she died, how long after she took it did she die, that sort of thing. And I think that's where this case... So we don't really know, of course, when she died, because they just find her body significantly later. Yeah, we don't. We don't have an exact time of death. Right. But we know the circumstances under which she died a lot better than we do in any of the other cases where the sort of death results enhancement gets applied. And Mr. Perroni admits to those circumstances, right? Exactly. So Mr. Perroni himself provides us with the key sort of eyewitness testimony about what it was that killed Ms. Learn. And it's the cocaine that he supplied her. I want to make sure... Well, but that's what I'm trying to get at. If she was already on the brink, or maybe if he hadn't even given her anything, she would have died anyway. I'm sure the cocaine he gave her didn't help. But was it a but-for cause of her death, is the Burrage question. Burrage says pretty convincingly, I think, that if... You do take your victim as you find them. So if this was the straw that broke the camel's back, then that's enough for the death results enhancement to apply. I want to make sure the records... So even if taking, you know, 100 milligrams of cocaine wouldn't kill anybody, if you gave 100 milligrams of cocaine to somebody who's already wasted and they die, it's your theory that Burrage says death results applies there. I think that's right. I think Burrage says... There's two different ways you can come at it. Was this a lethal dose? So it's the 10 units or the 12 units issue. So it doesn't matter what else was in the system, whether a perfectly healthy person or compromised for some other reason, they're going to die. Or is this a case where this is just the last little bit that puts them over the edge? But for this, they wouldn't have died. But you gave them this illicit substance and now they're dead. Either way, I think, the law says you're... Well, those are two really different standards. And given her state of, you know, compromise at the time he gives her these doses, it could make a difference here. Well, and I want to make sure this is clear, because it really wasn't in the appellant's brief. We try to clear it up in our brief. So Madonna Narag is the friend. She testified in front of the grand jury about the cocaine and the heroin that they did together in the morning, early morning hours, after their shift ended at the nightclub. And that's where this testimony about $50 worth of cocaine was purchased. So when we say early morning hours, is that April 17th? Or is that actually April 18th by now? So that's the key. That's April 17th. So it's like 1 a.m. April 17th. Yeah, exactly. Or whatever. But the night started out being April 16th and then it rolls over to April 17th? 17th, right. And so she doesn't die until the evening of April 18th. So she goes all the way through the day, the 17th, and then the 18th, and then into the evening. So you see this is almost two days later. Right. She's worked a full eight-hour shift and it's another whole day later. So we don't know. We know that there was a whole lot of cocaine in her system. But it's a little disingenuous to say, well, we know that some of that came from other sources. We don't know that. All we know is what Mr. Peroni says. He gave her 7 1⁄2 grams that night in three separate injections. And what both Dr. Long, the toxicologist, and Dr. Nanduri said, is that that's independently sufficient to have caused her death. Well, I didn't think it was quite that clear. They said the cocaine in her system was enough to kill her. But the question is about the other sources. Does the government have evidence that the 7 1⁄2 grams were enough to kill her? So we didn't have any expert that said 7 1⁄2 grams is per se lethal or something. No matter who you are, if you take that, you're going to die. I assume weight and other factors would come into it. And purity. We don't know the purity of this. Part of the problem here, given the shift in the law, we've got a guilty plea. We've got then a later shift in the understanding of causation. So part of the problem here, Mr. Stump, it seems to me, is burden of proof at this stage. And I had understood Bowsley to tell us that under these circumstances, it probably winds up being the defendant's burden to show. Either actual innocence or, for example, prejudice resulting from ineffective assistance. Yes, Your Honor. That's our understanding as well. And I'll hope Mr. Reedy can address that point as well in rebuttal. Because, I mean, the circumstances pretty clearly point towards Mr. Perroni's dosages being the fatal ones. But let me just make sure something's cleared up. It doesn't necessarily matter for these purposes who delivered the injection, does it? No, it doesn't. Is it agreed that it was Perroni who provided all 7 1⁄2 grams, regardless of who injected them? Mr. Perroni admitted both as part of his statement to the police, and then later gets incorporated into the PSR, and at sentencing his counsel acknowledged that he is responsible for giving her 7 1⁄2 grams. So we have no other context for that 7 1⁄2 grams. That's the injection statement, at least in your brief. On page 8, you say, this is a second interview, December 6, Appellant admitted that he injected Learn with 2.5 grams of cocaine three separate times for a total of 7.5. But that's not necessarily saying, I brought it with me and then I injected it. That's right. That's right. I guess that's an interesting question. If he didn't purchase the cocaine and he didn't procure it, but he's the one that injects it, I think I would still argue that that's distribution under the law, and that's still death resulting from the distribution. He doesn't have to be the one that injects it. Either delivery or thumb on the syringe would be enough. Can I ask you something about the shift in the law? So would you characterize it as a shift? I mean, as I kind of understand the lay of the land, Hatfield had been, it was on appeal, but there wasn't a Seventh Circuit case before that saying that you didn't have to show up for it, or it's my understanding that other circuits, the Supreme Court hadn't said that, it wasn't out there in other circuits. So we did have this district court decision that was being appealed. But would you characterize it, and does it matter, to be the case that everybody at the time of Peroni's hearing was operating under this regime of law where they thought but for wasn't required? Yeah, that's a great question. I don't think it was a dramatic shift in the law. I think if you read Hatfield, basically, and in Hatfield, the government specifically admitted that but for causation was the appropriate test. So it was not a situation like in Burrage where the government was trying to argue it should be something less than but for causation. And really what Hatfield said was really just to acknowledge what results from means. Results from, at a bare minimum, has to be but for causation. That can't be something less than that. And so where Hatfield comes into play is it's a jury instruction issue, where the jury was instructed in Hatfield that it could be something less than but for causation. And this court said, no, that was inappropriate. And what do you think about the plea agreement? In his plea agreement, when he says yes to causation, do you think that alone precludes it here? Because we don't have a situation here where he went to trial and it was a jury instruction argument. Do you think he has to have that kind of fine-grained appreciation for it to be valid? Or would you say that the fact that he pled to that element forecloses it now? That's a great question, too. I think if the standard was somewhat ambiguous, and it mattered somewhat in the facts situation, if this was one of those situations where we just have a dead body and we don't know, like the Gaylord case where we didn't know what happened, then I think it might actually matter his understanding of whether this was but for causation or something less than that. But because we got this case because he confessed to killing Terry Learn by injecting her with a lethal dose of cocaine, that Hatfield case really doesn't even come into play at his sentencing. It's not even an issue. Does that answer your question? Yes, it does. Thank you. I think my time's up. Anything else? I see nothing, so thank you very much. Thank you. Mr. Reedy. If I could start by answering Judge Hamilton's last question. I know the government addressed it, but I'd like to point to Supplemental Appendix pages 24 and 25. On 24, starting on line 22, where it says, Would that amount of cocaine all by itself cause someone to die and nor a new person? The answer, Dr. Nadori, was there have been reports that a small dose could kill a person. It all depends on how long a person would have lived after that. Sorry, I can't hear what you're saying. Sorry. Would that amount all by itself have been enough to cause someone to die? The bottom of essay 24. Would that amount of morphine all by itself cause someone to die, an ordinary person? And then she answers. And then also on 25, starting on line 16, or starting on line 14, the government asked her whether, but if I understand you correctly, you are not saying that would necessarily be true concerning the morphine in her bloodstream enough to kill her, essentially, that it wouldn't have necessarily been a lethal dose if it was by itself. She says, I'm not saying that. In other words, she's saying she's rejecting the contention that the heroin could not have been a lethal dose. I'd also like to address quickly the timing aspect of this. I don't think there's anything in the record indicating that Ms. Learn died the night of the 18th. All the evidence in the records indicates that she was on this consistent drug binge starting from about 2 to 4 a.m. the morning of the 17th all the way leading up to her death on the 18th. And I think a lot of, one thing I would like, the last point I'd like to make is to get back to the 7.5 grams. And that the government's new found contention that there's 7.5 grams here is contradicted by the district court's decision and the stipulation of facts that underlie the plea agreement. And I think at best this would be an evidentiary issue that should result in an evidentiary hearing and is not grounds for affirming the district court's decision which is purely based on the fact that the plea agreement mentioned cause in one instance. Okay. Well, thank you very much. And you were appointed, I believe? Yes. So we thank you very much for your efforts, for your client, and for the court. Thanks. Thanks as well to the government. We will take this case under review.